IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FARMERS INSURANCE COMPANY OF ARIZONA,

    Plaintiff,

v.                                                                 No. Civ. 14-722 LH/LAM

CANDIS POTTER,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Plaintiff Farmers Insurance Company of Arizona's (FICA) Motion for Summary Judgment. (ECF No. 26) The Court, having reviewed the motion, briefs, relevant law, and otherwise being fully advised, concludes that the motion is well-taken and shall be granted. The Court hereby enters summary judgment in favor of FICA on its claims for declaratory relief.

**A. BACKGROUND**

From February 2003 to February 2013, FICA issued a special form homeowners insurance policy to Defendant Candis Potter. (Mot. Summ. J. Ex. A, ECF No. 26) On April 1, 2014, Loren Schmidt, who had previously resided with Potter from 1998 to 2011, filed suit in New Mexico state court against Potter, alleging claims for intentional tort, battery, breach of fiduciary duty, accounting, conversion, injunctive relief, lien foreclosure, damages, and punitive damages. (ECF No. 1-1) Potter made a claim for defense and indemnification under her homeowner's insurance policy, and FICA subsequently agreed to defend her in the state action subject to a complete reservation of rights. (Mot. Summ. J. Ex. C)

In this federal declaratory judgment action, FICA asserts that it has no duty to defend or indemnify Potter in the underlying state action filed against her by Schmidt. (Compl. ECF No. 1) In its motion for summary judgment now before the Court, FICA contends that the factual allegations in the underlying suit do not trigger coverage under the homeowner's policy FICA issued to Potter. (Mot. Summ. J. at 2) Specifically, FICA contends that Schmidt's allegations in the underlying suit and Potter's deposition testimony do not give rise to an "occurrence" as set forth in the policy's personal liability coverage section, thereby barring coverage. (*Id.*) Alternatively, FICA contends that exclusions in the policy bar coverage for Potter in the underlying suit. (*Id.*)

1. **Policy Terms**

In pertinent part, the policy's personal liability coverage section states that: "We pay those damages which an insured becomes legally obligated to pay because of bodily injury or property damage resulting from an *occurrence* to which this coverage applies." (emphasis added) (Mot. Summ. J. Ex. A, ECF No. 26-1 at 10) The policy defines an "occurrence" as "an accident including exposure to conditions which results during the policy period in bodily injury or property damage." (*Id.* at 9) The term "bodily injury" is defined as "bodily harm, sickness or disease, including care, loss of services and death resulting from that injury." (*Id.* at 8) The term "property damage" is defined as "physical injury to or destruction of tangible property covered by this policy and resulting loss of use." (*Id.* at 9)

The policy furthermore excludes certain types of liability from coverage. In pertinent part, the policy's exclusions provide that the policy does not cover "bodily injury to any resident of the residence premises except a residence employee . . . ." (*Id.* at 14) The policy also excludes "bodily injury or property damage which[] is either: (a) caused intentionally by or at the

direction of an insured; or (b) results from any occurrence caused by an intentional act of any insured where the results are reasonable foreseeable." (*Id.*)

### 2. Factual Background in Underlying Suit

"In disputes stemming from insurance contracts, the duty to defend arises out of the nature of the allegations in the underlying complaint, and is determined by comparing the factual allegations in the complaint with the insurance policy." *Hartford Fire Ins. Co. v. Gandy Dancer, L.L.C.*, 981 F.Supp.2d 981, 1006 (D.N.M. 2013) (internal quotations and citations omitted). "If a complaint states facts that bring the case within the coverage of the policy, then the duty to defend will be triggered." *Id.* In this case, the Court will rely on the factual allegations in the underlying complaint[1] as well as the materials provided by the parties in their briefing on FICA's motion for summary judgment, namely the insurance policy documents, Potter's deposition, and her affidavit testimony. (ECF No. 26-1 to 26-5; ECF No. 27 Ex. 1 and 2) The relevant facts are set forth below:

As noted earlier, Schmidt and Potter lived together at Potter's property in Sierra County from 1998 to 2011. (Mot. Summ. J. Ex. B ¶¶ 2, 6, 37 (underlying state court complaint), ECF No. 26-3) On December 24, 2001, Schmidt suffered an apparent stroke and was subsequently diagnosed with General Conversion Disorder, a permanent neurological disorder, by the University of New Mexico Medical Center. (*Id.* ¶¶ 9–10) Schmidt alleges that while UNM Medical Center expressly ruled out a diagnosis of Parkinson's disease through exhaustive testing, a physician in Las Cruces diagnosed him with Parkinson's disease six months later and prescribed medication. (*Id.* ¶¶ 10, 17, 19) Schmidt alleges that he visited this doctor every three months for the next ten years to receive treatment and prescriptions for Parkinson's disease, and

---

[1] Although Potter indicated in her affidavit that the answer filed in the underlying suit was attached to the affidavit, the answer was not provided. (Potter Aff. ¶ 14, ECF No. 27 Ex. 1) Consequently, the only document in the record from the underlying suit is the complaint.

that each visit, Potter communicated with the medical staff on Schmidt's behalf. (*Id.* ¶¶ 20, 22) Schmidt also alleges that Potter sold some of his prescriptions and incorrectly administered the rest. (*Id.* ¶¶ 24, 28) Schmidt believes that Potter surreptitiously administered street drugs to him in order to induce Parkinson's-like symptoms in him for control of his daily activities, finances, and expected inheritance. (*Id.* ¶ 26) Schmidt claims that his general physical condition deteriorated over the next ten years and affected his speech, gait, memory, and functions of everyday life. (*Id.* ¶ 29) Nonetheless, Schmidt reports that he experienced sporadic periods of apparent improvement in his condition, during which he produced artistic illustrations and performed major repairs on Potter's property. (*Id.* ¶¶ 30-33) When Schmidt's father passed away, Schmidt inherited a share of his father's real estate in May 2011. (*Id.* ¶ 34-35) Schmidt alleges that although he gave his brother's son control over his inheritance, Potter took Schmidt to a bank and converted most of the inheritance proceeds in to cash or cashier's checks made out in her name. (*Id.* ¶ 36)

On June 25, 2011, an alleged domestic violence incident occurred between Schmidt and Potter. (*Id.* ¶ 36) Potter subsequently obtained temporary and permanent orders of protection against Schmidt, which prohibited him from coming within one hundred yards of Potter or her residence. (Candis Potter Aff. ¶ 7, Apr. 23, 2015, ECF No. 27 Ex. 1)

Late in the evening on May 2, 2012,[2] Schmidt alleges that he went to Potter's residence to retrieve his horse, "T-bone," after hearing that Potter planned to sell the horse. (Compl. ¶¶ 47–48) Once Schmidt retrieved the horse from the barn, he alleges he brought the horse up to the house's porch because he needed a halter, and there were none in the tack shed. (*Id.* ¶ 49) Schmidt alleges he stayed outside of Potter's house holding the horse by a rope while he asked

---

[2] Schmidt alleged that this incident occurred on May 2, 2012 (Mot. Summ. J. at 2), while Potter claims that it occurred on May 3, 2012 (Potter Aff. ¶ 8). This discrepancy is immaterial to the Court's analysis.

Potter for a halter. (*Id.* ¶¶ 49, 51) Schmidt alleges that Potter fired three shots at him "point-blank," and that one bullet hit him from behind and shattered his upper right arm. (*Id.* ¶¶ 50, 53) Schmidt alleges that when law enforcement arrived, he was lying in the yard forty feet south of the house and the horse was loose in the yard. (*Id.* ¶ 56)

Potter alleges that she awoke at 12:30 a.m. on May 3, 2012 when the dog that slept at the foot of her bed growled. (Potter Dep. 53:16-18, Mar. 13, 2015, ECF No. 26-5) As she turned over to go back to sleep, she heard a loud noise that she recognized as the back door to her house being kicked in. (*Id.* at 53:19-20; *see also* Potter Aff. ¶ 9) Potter alleges that she jumped out of bed, took her pistol (which was loaded, "cocked[,] and ready to use"), and left her bedroom to investigate the intrusion. (*Id.* at 57:13, 58:7-13, 53:23) Potter notes that she tried to turn on the hallway lights outside her bedroom, but that the lights did not turn on when she flipped the switch and she was left in darkness. (*Id.* at 53:23-54:1) Potter alleges she shouted, "Get out of my house" or, "What are you doing in my house" when she saw a figure advancing toward her. (*Id.* at 54:4-8) Potter alleges that she then fired her gun three or four times, backing up as she fired to protect herself and her property. (*Id.* at 54:7-9, 54:12-13, 60:5) Potter testified in her deposition that she "intended to shoot [the gun]" (*Id.* at 60:10) and that she was hoping she would "hit the target." (*Id.* at 60:24-25) Potter alleges that she realized that the figure she shot was Schmidt because she recognized his voice when she heard him say, "You got me." (*Id.* at 58:23-24)

Schmidt was arrested and criminally charged in state court as a result of the May 2012 incident. (Compl. ¶¶ 57-58, Potter. Aff. ¶¶ 12-13) The criminal case was later dismissed. (Compl. ¶ 64). Schmidt subsequently filed the underlying civil action against Potter that is at issue here. In this federal declaratory judgment action, FICA asserts that it has no duty under the

5

policy issued to Potter to defend or indemnify her in the underlying state civil action filed by Schmidt against her. (Compl. ECF No. 1) The Court will now turn to consider FICA's specific arguments in its motion for summary judgment.

### B. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

### C. ANALYSIS

In its motion for summary judgment, FICA raises two primary arguments. (Mot. Summ. J. at 11-12) First, FICA contends that the allegations raised against Potter in the underlying suit by Schmidt do not constitute an "occurrence," as defined in the policy, thereby barring coverage

under the policy. Alternatively, FICA argues that the exclusions set forth in the policy bar any defense or indemnity coverage for Potter in the underlying suit.

The parties agree that New Mexico law governs interpretation of the policy. (Mot. Summ. J. at 9; Resp. Br. at 4) Thus, the Court will consider decisions of the New Mexico Supreme Court and, where no controlling decision exists, consult other sources, including primarily decisions of the New Mexico Court of Appeals. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665-66 (10th Cir. 2007). Under New Mexico law, an insurance policy is considered a contract and is interpreted "in accordance with the same principles which govern the interpretation of all contracts." *See Lucero, Jr. v. Northland Ins. Co.*, 2015-NMSC-011, ¶ 4, 346 P.3d 1154 (internal citation omitted). The Court's "primary goal is to determine the intentions of the contracting parties . . . at the time they executed the [policy]." *Id.* "When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties." *Id.* "Thus, when the policy language is clear and unambiguous, we must give effect to the contract and enforce it as written." *Id.*

The Court's analysis of the policy at issue here involves interpretation of terms that are not defined in the policy. The New Mexico Supreme Court has affirmed that "an insurance policy is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense." *Battishill v. Farmers Alliance Ins. Co.*, 2006-NMSC-004, ¶ 8, 127 P.3d 1111 (internal citation omitted). "As with other contracts, where an insurance policy's terms have a common and ordinary meaning, that meaning controls in determining the intent of the parties." *United Nuclear Corp. v. Allstate Ins. Co.*, 2012-NMSC-032, ¶ 10, 285 P.3d 644 (internal citation omitted). "Where a policy term is reasonably and fairly

susceptible of different constructions, it is deemed ambiguous and must be construed against the insurance company as the drafter of the policy." *Id.*

   *1. Shooting Incident*

The Court begins its analysis with the May 2012 shooting incident. Relying on Schmidt's allegation that Potter intentionally shot at him and Potter's deposition testimony that she intentionally shot at the intruder, FICA argues that Potter's actions during the May 2012 incident cannot be classified as an accident, and therefore an occurrence, as defined by the policy. (Mot. Summ. J. at 12-16) Alternatively, FICA argues that even if the shooting is found to qualify as an occurrence, it is nonetheless excluded from coverage by the intentional acts exclusion. (Mot. Summ. J. at 16-18)

As stated earlier, the policy's personal liability coverage section states that: "We pay those damages which an insured becomes legally obligated to pay because of bodily injury or property damage resulting from an *occurrence* to which this coverage applies." (emphasis added) (Mot. Summ. J. Ex. A, ECF No. 26-1 at 10) The policy defines an "occurrence" as "an *accident* including exposure to conditions which results during the policy period in bodily injury or property damage." (emphasis added) (*Id.* at 9) The policy does not, however, define the term "accident." The Court will therefore look to New Mexico case law to define this term.

In *Vihstadt v. Travelers Insurance Co.*, the New Mexico Supreme Court explained that "[w]henever the word 'accident' is not defined in the insurance policy, the word must be interpreted in its usual, ordinary and popular sense." 1985-NMSC-104, ¶ 6, 103 N.M. 465, 709 P.2d 187 (internal quotation omitted). An accident, "[i]n its ordinary, popular sense . . . [is] an event occurring without design or purpose, or unintentionally on the part of the assured. . . . But it does not include the result of wilful design." *King v. Travelers Ins. Co.*, 1973-NMSC-013, ¶ 8,

84 N.M. 550, 505 P.2d 1226 (quotation omitted). On the contrary, "undoubtedly the intentional infliction of injury cannot be regarded as an accident and conduct may be so heedless as to be equated to the willful." *Id.* ¶ 10. The court explicitly rejected "that the term 'accident' [can] be viewed as referring either to the *means* of incurring the injury or to the ultimate *result*." *Vihstadt*, 1985-NMSC-104, ¶ 11 (emphasis in original). The court reiterated, "[i]f there was no accident in the means, there was none in the result, for the two [are] inseparable. . . . There was an accident throughout, or there was no accident at all." *Id.* ¶ 12 (quotation omitted). In sum, an accident "within the terms of an accident policy, is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause." *Id.* ¶ 9.

Here, Potter's undisputed deposition testimony with regard to the May 2012 shooting incident is that she "intended to shoot the intruder," that she was "hoping [she] would hit the target," and that she "intended to shoot [the gun], but [she] did not intend to shoot Loren Schmidt." (Potter Dep. 60:6-12, 60:24-25) Potter further stated in her affidavit that she "took [her] hand gun with [her] as [she] left the bedroom" and that she "shot the invader in an effort to stop him as he moved toward [her]." (Potter Aff. ¶ 11) Although Potter disputes whether she 'aimed' her shots, she admits in her response to FICA's motion for summary judgment that she shot "her .32 caliber Smith & Wesson three or four times *intending to hit the intruder* who, after the fact, turned out to be [] Schmidt." (emphasis added) (Def. Resp. at 1) Based on the foregoing unequivocal testimony, the Court finds that there is no genuine dispute that Potter's actions were intentional and deliberate, rather than accidental acts. *See Mid-Continent Casualty Co. v. Circle S Feed Store, LLC*, 754 F.3d 1175, 1181 (10th Cir. 2014) (stating that "[u]nder New Mexico law, the term 'accident' in an insurance policy 'expresses the thought of an event occurring without design or purpose, or unintentionally on the part of the [insured].'").

Potter's primary argument in her response to FICA's motion for summary judgment is that the policy's terms are ambiguous because they do not account for actions taken in self-defense. Specifically, relying on *Safeco Insurance Co. v. Tunkle*, 997 F. Supp. 1356 (D. Mont. 1998), Potter contends that an "occurrence" or "accident" may encompass an intentional shooting, as long as it was done in self-defense. The Court is not persuaded by Potter's argument. As a federal district court decision from another circuit that applied Montana state law on insurance policies, *Safeco* has no persuasive or binding authority on this Court.[3] While Potter cites to *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979 (10th Cir. 1994) in support of this argument, FICA correctly points out that *Mhoon* is distinguishable because it specifically concerned a clause in a business policy available to the insured that covered the insured for intentional acts "if such injuries, arise solely from the use of reasonable force for the purpose of protecting persons or property." *Id.* at 986-87. The policy at issue in this case has no similar provision.

With regard to the shooting incident, Potter lastly requests that the Court defer its summary judgment ruling so that Potter can undertake additional discovery to determine if Schmidt's allegations of intentional conduct can be substantiated. (Resp. at 11) The Court finds no basis to defer its ruling as Potter has offered no explanation for her failure to undertake this discovery prior to the March 18, 2015, deadline set in this case. (*See* ECF No. 16)

---

[3] Furthermore, as FICA notes in its reply brief, other jurisdictions that have addressed this issue reached different rulings than *Safeco*. (Reply at 7) For example, the Eastern District of Pennsylvania held, "[p]eople who are defending themselves act intentionally—not negligently or accidentally—in the interest of self-preservation. One acting in self-defense reasonably believes that one is threatened, and then responds to that belief—this constitutes an intentional act." *Utica First Ins. Co. v. Maclean*, Civ. No. 08-1138, 2009 WL 415988 at *275; *see also* Allan D. Windt, 3 Insurance Claims and Disputes § 11:3 (6th ed. 2015) (observing that "a volitional act intended to cause injury is not an occurrence simply because the insured was acting in self-defense.").

Based on the foregoing, the Court concludes that there is no genuine dispute of material fact regarding Potter's conduct during the May 2012 shooting incident. Potter has failed, for purposes of summary judgment, to establish that the shooting was an accident, and therefore an occurrence, necessary to trigger coverage under the policy.

    2. *Remaining Factual Allegations (Overmedication and Conversion Allegations)*

FICA next contends that it is entitled to summary judgment with respect to the remaining factual allegations raised by Schmidt against Potter in the underlying suit—these allegations concern claims of overmedication and mishandling of Schmidt's medical care as well as conversion of Schmidt's property and other assets. FICA argues that these acts cannot be considered occurrences and therefore are not covered by the policy. Potter failed to address these arguments in her response; more significantly, she has not submitted any evidence to controvert Schmidt's allegations in the complaint that Potter acted *intentionally* to overmedicate him and convert his assets while they still resided together. Because Potter failed to provide any alternative reading or version of the conversion allegations, the Court views these facts as proposed by Schmidt as undisputed. These intentional acts are, by nature, not accidental. As such, the Court finds that they are not covered by the policy.

The Court need not determine whether Schmidt has claimed sufficient bodily injury or property damage to trigger coverage under the policy based on the allegations of conversion and overmedication/mishandling of Schmidt's medical care because the uncontroverted evidence is that the intentional nature of these acts disqualifies them from being occurrences that trigger coverage. Moreover, the Court notes that the undisputed evidence is that Schmidt was a resident of Defendant's property during the years that these alleged intentional acts occurred. The policy excludes personal liability for "property damage to property owned by an insured or any other

resident of your household." (Compl. Ex. B, ECF No. 1-2 at 4, 15) Likewise, the policy excludes from coverage "bodily injury to any resident of the residence premises except a residence employee . . . ." (Pl.'s Mot. Ex. A, ECF No. 26-1 at 11).

## D.  CONCLUSION

The Court concludes that FICA is entitled to summary judgment and therefore, FICA has no duty to defend or indemnify Potter in the underlying state action filed against her by Schmidt. **IT IS HEREBY ORDERED** that FICA's motion for summary judgment (ECF No. 26) is granted. A final judgment shall be entered separately.

**IT IS SO ORDERED.**

_____
SENIOR UNITED STATES DISTRICT JUDGE